HIGH ROCK LAKE ASSOCIATION INC., AND MARY DAVIS v. NORTH CAROLINA ENVIRONMENTAL MANAGEMENT COMMISSION, AND H.W. WHITLEY, CHAIRMAN OF THE NORTH CAROLINA ENVIRONMENTAL MANAGEMENT COMMISSION

No. 8010SC722

(Filed 7 April 1981)

Waters and Watercourses § 3; Administrative Law § 4– river basin not declared capacity use area – no arbitrary or capricious action
    The Environmental Management Commission did not act arbitrarily or capriciously in deciding not to declare the Yadkin River Basin a capacity use area.

APPEAL by petitioners from *Herring, Judge.* Order entered 28 April 1980, in Superior Court, WAKE County. Heard in the Court of Appeals 11 February 1981.

This case is a direct outgrowth of the plans of Duke Power Company (hereinafter Duke), not a party to the suit, to construct and operate a nuclear power station, known as the Perkins Plant, on the Yadkin River in Davie County. Plaintiffs are an association of riparian property owners on High Rock Lake, which is downstream from the proposed plant, and an individual riparian landowner on the Yadkin River. Defendant, the Environmental Management Commission of the North Carolina Department of Natural Resources and Community Development, formerly the Department of Natural and Economic Resources (both hereinafter referred to as the Department), is charged with the responsibility of applying the Water Use Act of 1967, G.S. 143-215.11 *et seq.*

In its plans to construct the Perkins Plant, Duke proposes to withdraw from the Yadkin River up to 72,000,000 gallons of water per day, or 112 cubic feet of water per second (cfs), to be

used primarily in the operation of a closed cycle cooling system. Public concern over the environmental effects of Duke's proposed water use caused the Environmental Management Commission (hereinafter Commission) to direct the Department to study the proposed use and make a recommendation as to whether all or part of the Yadkin River Basin should be declared a capacity use area pursuant to G.S. 143-215.13. In July 1976, the Department submitted a report recommending that the Commission not declare the basin a capacity use area.

Nevertheless, the Commission, after a public meeting in September 1976, decided to hold two public hearings on the question of declaring the Yadkin River Basin a capacity use area. After the hearings, the Commission adopted Resolution 76-41 in which it found that, although the proposed plant would affect the quantity and quality of downstream water, imposition of conditions for withdrawing the water would be sufficient to protect downstream users. Resolution 76-41 contained a list of conditions which will be reviewed in the opinion.

After the adoption of Resolution No. 76-41, plaintiffs sought judicial review in Superior Court, Wake County. The trial court's dismissal of plaintiffs' complaint for lack of jurisdiction was affirmed on other grounds by this Court in *High Rock Lake Association v. Environmental Management Commission*, 39 N.C. App. 699, 252 S.E. 2d 109 (1979). In the opinion written by Morris, Chief Judge, the Court noted that the Commission's action, which the Court found to be part of the Commission's rule-making function, was properly reviewable by procedures outlined in the Administrative Procedure Act, G.S. 150A-1 *et seq.*, *i.e.*, by first seeking a declaratory ruling pursuant to G.S. 150A-17 and thereafter presenting the matter for review pursuant to G.S. 150A-43.

In April 1979, under G.S. 150A-17, plaintiffs requested a declaratory ruling as to the validity of Resolution No. 76-41 and as to the applicability of the Water Use Act of 1967. In Declaratory Ruling No. 79-1, dated 14 June 1979, the Commission determined that Resolution 76-41 was valid and that it constituted the Commission's determination regarding the Applicability of the Water Use Act to the Yadkin River Basin. Thereafter, pursuant to G.S. 150A-17 and G.S. 150A-43, plaintiffs sought judicial review in Superior Court of Wake County. On 28 April 1980,

the court affirmed Declaratory Ruling No. 79-1, finding that none of the six grounds for reversal under G.S. 150A-51 existed. From that order, plaintiffs have appealed to this Court.

*Attorney General Edmisten, by Assistant Attorney General Daniel C. Oakley, for the State.*

*Pfefferkorn and Cooley, P.A., by Robert M. Elliot, for plaintiff appellants.*

ARNOLD, Judge.

A declaratory ruling by an administrative agency is subject to judicial review as though it were an agency final decision or order in a contested case. G.S. 150A-17. Article 4 of Chapter 150A defines the judicial review process, and, within that Article, G.S. 150A-51 establishes the scope of review as follows:

Scope of review; power of court in disposing of case. — The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the agency findings, inferences, conclusions, or decisions are:

(1) In violation of constitutional provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Unsupported by substantial evidence admissible under G.S. 150A-29(a) or G.S. 150A-30 in view of the entire record as submitted; or

(6) Arbitrary or capricious.

If the court reverses or modifies the decision of the agency, the judge shall set out in writing, which writing shall become a part of the record, the reasons for such reversal or modification.

In the case before us, plaintiffs' only argument is that the superior court erred in affirming the declaratory ruling of the Commission and in failing to find the Commission's ruling arbi-

trary and capricious. Plaintiffs contend that the evidence before the Commission showed a grave threat to water quantity and quality in the Yadkin River and High Rock Lake area, and that this threat *required* the Commission to designate the area a capacity use area pursuant to G.S. 143-215.13.

It is important to note at the outset that, under G.S. 143-215.13, the Commission's determination of capacity use areas is discretionary. G.S. 143-215.13 reads in pertinent part:

(a) The Environmental Management Commission *may* declare and delineate from time to time, and *may* modify, capacity use areas of the State where it finds that the use of groundwater or surface water or both require coordination and limited regulation for protection of the interests and rights of residents or property owners of such areas or of the public interest. [Emphasis added.]*

The question raised by plaintiffs and addressed by this Court is whether the Commission acted arbitrarily or capriciously in

---

*The proper scope of judicial review for the Commission's determination that a given area should or should not be declared a capacity use area would appear to be whether the Commission has abused its discretion. We note that, under G.S. 150A-51, this scope of review is not enumerated. In this regard, North Carolina's definition of scope of review differs from the Federal Administrative Procedure Act which specifically excludes judicial review of agency action which is discretionary. 5 U.S.C. § 701(a)(2). Under 5 U.S.C. § 706 (2) (A), however, the reviewing court is empowered to hold unlawful and set aside agency actions, findings, and conclusions which the court determines to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ...." This section leads at least one commentator to conclude that discretionary agency action is reviewable under the Federal Administrative Procedure Act. B. Schwartz, Administrative Law § 152 (1976).

Section 15(g)(6) of the Revised Model State Administrative Procedure Act, which does not specifically exclude judicial review of discretionary agency decisions, states that the reviewing court may reverse or modify agency decisions which are "arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." The Comment on this section states that " 'clearly unwarranted exercise of discretion' has been specifically equated to 'arbitrary action.' "

making findings unsupported by substantial evidence in the record, G.S. 150A-51(5), and in thereafter concluding that the Yadkin River Basin need not be declared a capacity use area. In this review, we are guided by the standard of judicial review known as the "whole record" test. This test properly takes into account the specialized expertise of the staff of an administrative agency, and, thus, does not allow the reviewing court to substitute its own judgment for that of the Commission. It does require, however, that the court take into account evidence in the record which fairly detracts from the weight of the evidence the Commission relied upon to make its decision. *See Thompson v. Board of Education*, 292 N.C. 406, 410, 233 S.E. 2d 538, 541 (1977), in which the "whole evidence" test in the predecessor to G.S. 150A-51 was discussed.

After careful scrutiny of the record, this Court concludes that the trial court properly affirmed the decision of the Commission not to declare the Yadkin River Basin a capacity use area.

Under G.S. 143-215.13(b), a "capacity use area" is defined as one in which

the Environmental Management Commission finds that the aggregate uses of groundwater or surface water or both, in affecting said area (i) have developed or threaten to develop to a degree which requires coordination and regulation, or (ii) exceed or threaten to exceed, or otherwise threaten or impair, the renewel or replenishment of such waters. ...

---

Although we have been unable to locate legislative history explaining why the North Carolina General Assembly chose to omit the "abuse of discretion" clause from its scope of review, we conclude that the North Carolina Act does not preclude judicial review of agency decisions which are discretionary. Our conclusion is based on the following: (1) the fact that the legislature did not specifically exclude such review; and (2) the way which the terms "arbitrary and capricious" and "abuse of discretion" are used interchangeably both in North Carolina and elsewhere. *See Welch v. Kearns*, 261 N.C. 171, 134 S.E. 2d 155 (1964); 2 Am. Jur. 2d, Administrative Law § 620.

To our knowledge, the Commission has never adopted guidelines which would give clearer meaning to this broad statutory language.

At the hearings on the Yadkin River Basin, the following evidence was adduced. Duke's Perkins Plant has an estimated water consumptive use of up to 112 cfs. This water will be supplied from an impoundment or impoundments Duke will construct on a tributary or tributaries of the Yadkin River. Duke proposes to withdraw water from the Yadkin River to replenish the supply in the impoundment or impoundments.

According to a National Eutrophication Survey prepared by the Environmental Protection Agency, High Rock Lake is eutrophic; in 1973, when 16 North Carolina lakes were studied, it ranked last in overall trophic quality. In the investigation completed by the Department, the staff developed models which showed the effect of the proposed Perkins Plant. Under one set of assumptions, the staff found that the model indicated that, if Perkins were completed and ALCOA ( which operates four hydroelectric generating facilities on the Yadkin River) attempted to generate the same amount of power as they did during some years in the past, the power pool of High Rock Lake would be completely drained. The study, however, noted that the assumptions on which the various models were developed were speculative, and the staff concluded that

> In our opinion, the major impact will be on the loss of hydroelectric generating power and not on lake levels. In the future, the primary effect of reduction of streamflows in the High Rock Lake will create a loss of power, but not necessarily significantly affect lake levels. The most noticeable effects caused by the Perkins generating facility or any other future upstream water consuming project will be on the streamflows below the project and on the loss of power produced by ALCOA and CP&L.

In the Final Environmental Impact Statement prepared by the Nuclear Regulatory Commission, there was a statement that the average monthly loss of water as a percentage of upstream average river water flow at 100% load capacity would range from 2.6% in March to 6.2% in September; such reductions "may cause adverse impacts on some downstream users of Yadkin River water." The report continues:

Only tentative plans for the withdrawal of water during periods of critical low flows have been set forth by the applicant. Negotiations are under way with the State of North Carolina to arrive at a definite minimum river flow at which proposed pumping rates will still be allowed. The applicant is presently proposing an impoundment on Carter Creek to supply sufficient supplemental storage of water to permit operation when flows drop below the eventual State-established maximum requirements. Until more definitive plans are presented, the staff will base its analysis on a flow of 880 cfs, a figure recently proposed by the applicant after discussion with State personnel. Under this mode of operating, pumping of water into the NSW Pond from the Yadkin River without compensating releases from Carter Creek Impoundment would only be permitted when river flows exceeded 880 cfs plus the amount being consumed by PNS [Perkins]. This means that when the plant is operating at the maximum consumptive use (112 cfs) and the flow in the river starts to drop below 992 cfs (880 + 112) as measured at the Yadkin College gauge, which lies between Carter Creek and the intake for PNS, the applicant must start to release water from Carter Creek in order to maintain the flow at 992 cfs at Yadkin College. This will maintain flow downstream of PNS at 880 cfs. If the river flow continues to decrease, the applicant must increase his release rate until it reaches 112 cfs (the consumptive use at PNS).

Plaintiffs point to the following portion of the impact statement:

The full pond storage volume of the lake is about 250,000 acre-ft. ... The consumptive use of 112 cfs by PNS during the period from May 15 to September 15 would be equal to a total of about 27,100 acre-ft. ... A loss of 27,100 acre-ft of water would lower the lake level about 2 ft below normal by September 15 if it is assumed that all other releases of water by the dam were the same as in the past. The only means available to mitigate this effect, besides reducing the consumptive loss of water by PNS, would be to correspondingly reduce the releases of water from High Rock Lake dam; however, the restrictions of the project's FPC operating license limit this option.

The impacts of a 2-ft below normal reduction in summer lake level on High Rock Lake would be to: (1) decrease the area of the reservoir by about a maximum of 1000 acres by September 15, (2) decrease the desirability of the lake for swimming by increasing the exposure of mud flats and swimming hazards such as stumps and rocks, and (3) increase the boating hazards of the lake. High Rock Lake is an uncleared lake and is considered one of the most hazardous lakes in the High Rock chain. Any increased drawdown of the lake would be expected to increase this hazard.

The report continues, however:

Several factors must be considered to put the potential increased drawdown into perspective. A full 2-ft drop in lake level by September 15 would only occur if all three units of PNS were operating at 100% capacity throughout the summer. If less than three units were operating and/or if any of the units was [Sic] operating at less than 100% capacity, the resultant reduction in the lake level would be proportionally less. It should be reiterated that the full 2-ft drop below normal would only be reached by about September 15 and would be proportionally less earlier in the summer. ... From this figure it can be ascertained that an additional 2-ft drop by September 15 would still keep the total drawdown to less than 5 ft during most of the summer. The Staff concludes that the lake level will probably drop to the 5 ft-below-full-pond level by September 15 nearly every year the station operates at full power throughout the summer.

In the summary on impacts on water use, the Nuclear Regulatory Commission concluded that the operation of Perkins Plant would cause (1) a minor decrease in water quality; (2) a slight reduction in the waste assimilative capacity of the Yadkin River; (3) probably no adverse reduction of water supply for downstream users, but increased difficulty maintaining desired lake levels in High Rock Lake during prolonged periods of below normal river flows; and (4) a decrease in the availability of water for hydroelectric power generation.

After reviewing this and other evidence, the Commission found that, among other things, "while Duke's proposed water use will affect downstream water quantity and quality, mea-

sures short of declaring a capacity use area . . . can be taken to protect . . . downstream users. . . . " The Commission then concluded:

The North Carolina Environmental Management Commission ("The Commission") has no objection to Duke's withdrawal and consumptive use of water from the Yadkin River provided Duke strictly complies with the following conditions and that these conditions are made a part of any permit or license issued by the U.S. Nuclear Regulatory Commission pursuant to 42 U.S.C. 2131 et seq. and any certificate of necessity and convenience issued by the N.C. Public Utility Commission pursuant to N.C.G.S. 62-110 and 110.1.

(1) Duke will make no net withdrawals from Yadkin River when the streamflow is less than 1,000 cfs (645 MGD).

(2) Duke will limit net withdrawals from Yadkin River to not more than 25% of the total streamflow, or not more than that portion of this measured total streamflow that is in excess of 1,000 cfs, whichever is the lesser quantity (refer to Analysis of Yadkin River Flows with Perkins Power Plant Under Proposed DNER Withdrawal Restrictions included as Attachment A to this Resolution).

(3) Duke's maximum daily consumptive use of water due to forced evaporation will not exceed 112 cfs (72 MGD).

(4) These conditions will be reviewed by the Environmental Management Commission at not less than 5 year intervals and will be subject to whatever modifications the Commission deems necessary to conserve and protect water resources in the public interest, including any modification that may arise from declaration of capacity use area pursuant to G.S. 143-215.11 et seq. and/or issuance of an order pursuant to N.C.G.S. 143-215.13(d).

(5) That Duke establish a suitable system for monitoring and reporting water withdrawals and water releases which is acceptable to the Director, Division of Environmental Management.

(6) That as a part of its findings, should it issue a Certificate of Convenience and Necessity, the Utilities Commis-

sion find that the use of mechanical draft cooling towers is necessary to the construction and operation of the Perkins Plant, this stipulation is made solely in light of the Environmental Management Commission's concern for the quantity of water consumed by cooling towers and the fact that it presently appears to be law in the Fourth Circuit that the EPA cannot require cooling towers in lieu of cooling lakes and that cooling lakes evaporate significantly less water than do cooling towers.

Be it further resolved that the Commission hereby directs the Director, Division of Environmental Management, to initiate steps on behalf of the Commission, including intervening or participating in hearings of the NRC and PUC to insure that all of the conditions in Section B are included in the appropriate license or certificate, including a provision that the NRC and PUC license, certificate or permit is subject to future action by the Environmental Management Commission pursuant to N.C.G.S. 143-215.11 et al, and that in the event either agency fails for any reason to include all of these conditions in its license or certificate, the Director is instructed to so report to the Commission at its next meeting.

From the foregoing, it appears to this Court that the Commission did not act arbitrarily or capriciously in refusing to declare the Yadkin River Basin a capacity use area. Indeed, the record shows a high degree of concern about the effects of the Perkins Plant, and Resolution 76-14 reflects an effort on the part of the Commission to reduce those effects with action short of declaring the Basin a capacity use area. While there was evidence of the adverse effects of Perkins Plant, this Court, as the trial court, is not in a position to substitute its judgment for that of the Commission; we can only conclude that in view of the entire record the judgment of the Commission in this matter was supported by competent, material and substantial evidence, and was neither arbitrary nor capricious.

For the reasons stated above, the judgment of the trial court is

Affirmed.

Judges CLARK and MARTIN (Harry C.) concur.