McCASKILL v. DEP'T OF STATE TREASURER

[204 N.C. App. 373 (2010)]

DONALD C. McCASKILL, PLAINTIFF-APPELLANT v. DEPARTMENT OF STATE
TREASURER, RETIREMENT SYSTEMS DIVISION, DEFENDANT-APPELLEE

No. COA09-778

(Filed 15 June 2010)

1. **Administrative Law— judicial review of agency decision—failure to adopt findings of fact**

The Board of Trustees of the Teachers' and State Employees' Retirement System did not commit prejudicial error by failing to adopt certain of the administrative law judge's findings of fact including numbers 29, 30, 31, 33, 34, 36, 37, 38, 39, 40, and 41 in a case determining that petitioner was not eligible for long-term disability benefits because he had not accumulated five years of membership service in the retirement system.

2. **Pensions and Retirement— settlement agreement—long-term disability benefits—eligibility under state retirement system—unpaid leave inapplicable**

The trial court did not err by concluding that the parties' settlement agreement did not provide petitioner with sufficient "membership service" to render him eligible to receive long-term disability benefits under the State Retirement System. Generally, an employee gets a day's credit for a day's work. Eligibility for long-term disability benefits does not include periods when an employee is on unpaid leave. Further, 25 N.C.A.C. 1B.0436 requires the submission of a settlement agreement to the Office of State Personnel for approval, and Department of Health and Human Services was not entitled to provide petitioner with binding assurances that the retirement system would accept the approach adopted in the settlement agreement.

3. **Contracts— settlement agreement—eligibility under state retirement system—State only liable upon contracts authorized by law**

Petitioner was not entitled to enforce a settlement agreement against the State Retirement System regardless of his eligibility for such benefits. The mere fact that petitioner and Department of Health and Human Services entered into a contract that both parties hoped would render petitioner eligible to receive long-term disability benefits did not automatically entitle him to receive such benefits. Although the State is bound by its contracts, it is liable only upon contracts authorized by law.

**4. Estoppel— settlement agreement—no justifiable reliance**

The State Retirement System was not estopped from denying petitioner's claim for long-term disability benefits, and the trial court did not err by concluding that neither the elements of estoppel nor quasi-estoppel were present in this case. The failure of the parties to submit the settlement agreement for approval by the Office of State Personnel as required by 25 N.C.A.C. 1B.0436 or consult with the Retirement System precluded anyone from justifiably relying on the beliefs of the relevant Department of Health and Human Services officials that the approach adopted in that agreement would pass muster with the Retirement System.

Judge ROBERT C. HUNTER dissenting.

Appeal by petitioner from order entered by 23 February 2009 by Judge Orlando F. Hudson, Jr., in Durham County Superior Court. Heard in the Court of Appeals 18 November 2009.

*Stark Law Group, PLLC, by Thomas H. Stark and Seth A. Neyhart, for petitioner-appellant.*

*Attorney General Roy A. Cooper, by Special Deputy Attorney General Robert M. Curran, for respondent-appellee.*

ERVIN, Judge

Petitioner Donald C. McCaskill appeals from the trial court's 23 February 2009 order affirming the Final Decision of the Board of Trustees of the Teachers' and State Employees' Retirement System, in which the Board determined that Petitioner was not eligible for long-term disability benefits because he had not accumulated five years of membership service in the Retirement System. After careful consideration of Petitioner's challenges to the trial court's order in light of the record and the applicable law, we conclude that the trial court's order should be affirmed.

I.  Statement of Facts

A.  Substantive Facts

Petitioner entered the employment of the DHHS as a Physician's Assistant at Dorothea Dix Hospital in October, 1997. At that point, he began contributing to the Retirement System. On 6 December 2001, DHHS terminated Petitioner from its employment. As of that date, Petitioner had four years and three months of membership service in the Retirement System.

Shortly after his termination, Petitioner began the process of challenging his dismissal. By the time that Petitioner reached Step 3 of the grievance process, he had experienced a complete, permanent hearing loss. Based upon his hearing loss, Petitioner "sought short-term disability benefits." In response to his application for short-term disability benefits, DHHS certified that Petitioner had accrued thirty days of vacation and forty-two days of sick leave as of 6 December 2001.

Before a Step 3 evidentiary hearing could be held, Petitioner and DHHS signed a settlement agreement which provided, in pertinent part, that:

> WHEREAS, all parties have agreed that [Petitioner] be reinstated to employment with [DHHS] for the purpose of allowing him to use his accumulated sick and vacation leave hours to maintain his employment until he has attained five (5) years of contributing service in the Retirement System for Teachers and State Employees.

THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:

1. [Petitioner's] December 6, 2001, dismissal from employment at [DHHS] shall be rescinded.

2. [Petitioner] shall be reinstated to a full-time permanent position, effective December 7, 2001. From December 7, 2001, through December 31, 2001, [Petitioner] shall be in full-time employment status (40 hours per week) and will use his accumulated sick and vacation leave to cover that time. From January 1, 2002, until September 9, 2002, and for 3 ½ hours on September 9, 2002, [Petitioner] will be placed on three-quarter time (30 hours per week) during which time he will exhaust his accumulated sick and vacation leave; provided, the total number of work days from January 1, 2002, through September 9, 2002, for which [Petitioner] does not have sufficient sick or vacation leave will be equally apportioned to each month during this period and treated as leave without pay.

. . . .

5. [DHHS] recognizes that [Petitioner] may file for temporary and permanent disability pay and [DHHS] agrees not to oppose and cooperate in attempting to obtain such disability status.

. . . .

6. [Petitioner] shall voluntarily withdraw his pending grievance against [DHHS] and shall waive any and all appeal rights he might have under State and Federal law arising out of his December 6, 2001, separation from [DHHS] employment.

7. [Petitioner] shall submit to [DHHS] prior to or within thirty (30) days from the execution of this Agreement, a written resignation from employment, effective September 9, 2002.

According to the trial court's findings, the settlement agreement sought to take advantage of the fact that the Retirement System generally gave a month's credit for each month in which the employee worked in determining his or her eligibility for benefits. As the trial court noted, "[t]he agreement did not provide for Petitioner to ever actually return to work," "and Petitioner did not in fact return to work."

Although this settlement agreement was signed by Petitioner and DHHS Secretary Carmen Hooker Odom, it was never reviewed or approved by the Office of State Personnel or the Retirement System. According to Marshall Barnes, who served as Deputy Director of the Retirement Systems Division, the Retirement System would not have approved this settlement agreement had it been submitted for approval. Similarly, Drake Maynard of the Office of State Personnel testified that "the rescission of [Petitioner's] dismissal, his reinstatement, any change in salary and the change from a forty-hour position to a thirty-hour position all require[d] the processing of personnel action forms."

According to the ALJ decision, DHHS officials did, however, review the settlement agreement for compliance with State Personnel and Retirement System rules. Bill Guy, Assistant Human Resources Director and Employee Relations Manager for DHHS, reviewed the settlement agreement to ensure its compliance with State Personnel rules governing settlements and consulted with Carolyn Williams and Dianne Hoffman, both of whom were long-time DHHS employees with knowledge of human resource issues, "to ensure that the settlement agreement complied with the applicable North Carolina rules, statutes, and regulations on retirement issues." Mr. Guy relied on Ms. Williams' assurances that the settlement agreement did not violate any retirement-related rules, statutes, or regulations and would not have approved the settlement agreement if he had thought that it did.

After the execution of the settlement agreement, Petitioner was retroactively reinstated to his position on a 40 hour per week basis

from 7 December 2001 through 31 December 2001. Beginning on 1 January 2002, Petitioner was treated as a 30 hour per week employee. According to the trial court, "pay forms were created after the fact which show that Petitioner was paid a lump-sum total of $20,296.40 for 16 days in January, 11 days in February, 11 days in March, 12 days in April, 12 days in May, 11 days in June, 13 days in July, 13 days in August and 6 days in September," with the "remaining days in each month shown as 'leave without pay.' " Although no retirement contributions were made on Petitioner's behalf for the months of January through June, 2002, a relatively large contribution was made in the month of July and "a written statement showing that the retirement contributions made in July represented salary paid to Petitioner for the months of January through July" was submitted in "approximately September 2002."

## B.  Procedural Facts

In February, 2003, Petitioner applied to the Retirement System for long-term disability benefits. At that time, he certified that his last actual day of work was 6 December 2001 and that his "date of termination from permanent full-time employment" was 9 September 2002. DHHS certified that the last day that Petitioner worked and the date upon which his disability began was 6 December 2001.

The Retirement System initially processed Petitioner's application for long-term disability benefits and approved his application. However, after a Retirement System benefits analyst reviewed Petitioner's application, she questioned his service eligibility. On 29 August 2003, the Retirement System notified Petitioner that he lacked the five years of membership service necessary to make him eligible for long-term disability benefits on the grounds that "the days of unused, accrued paid leave which Petitioner had purportedly exhausted from January to September 2002 totaled 104 days which, if exhausted continuously, would have covered the period only from January to May, thus providing five months of service rather than the nine months which Petitioner" claimed to have earned. After an exchange of correspondence with Petitioner and his counsel, the Retirement System denied Petitioner's request for long-term disability benefits on 17 December 2004.

On 5 February 2005, Petitioner filed a contested case petition with the Office of Administrative Hearings for the purpose of challenging the Retirement System's denial of his request for long-term disability benefits. On 4 January 2008, Melissa Owens Lassiter,

Administrative Law Judge, issued a Decision determining that the Retirement System should "REVERSE its initial decision to deny Petitioner long-term disability benefits, and grant Petitioner long-term disability benefits." On 28 April 2008, the Board issued a Final Decision stating that "Petitioner did not have five years of membership service when he applied for long-term disability benefits."

On 3 July 2008, Petitioner filed a Petition for Judicial Review seeking review of the Board's Final Decision by the Superior Court of Durham County. On 23 February 2009, the trial court entered an Order finding "that Petitioner did not have five years of membership as a result of the July 2002 settlement agreement with DHHS, and therefore the Retirement System properly denied his application for long-term disability benefits on that basis." On 20 March 2009, Petitioner noted an appeal to this Court from the trial court's order.

## II.  Legal Analysis

### A.  Standard of Review

Since the present case is before us on appeal from a trial court order reviewing the decision of an administrative agency, "[t]he scope of review to be applied by the appellate court . . . is the same as it is for other civil cases." N.C. Gen. Stat. § 150B-52. " 'When this Court reviews appeals from superior court either affirming or reversing the decision of an administrative agency, our scope of review is twofold . . . .: (1) whether the superior court applied the appropriate standard of review and, if so, (2) whether the superior court properly applied this standard.' " *Corbett v. N.C. Div. of Motor Vehicles*, 190 N.C. App. 113, 118, 660 S.E.2d 233, 237 (2008) (quoting *Mayo v. N.C. State Univ.*, 168 N.C. App. 503, 507, 608 S.E.2d 116, 120 (2005)). As a result, the nature and extent of our review under N.C. Gen. Stat. § 150B-52 is heavily dependent upon the scope of review applicable to the Superior Court in administrative review proceedings.

Generally speaking, the scope of review applicable to Superior Courts engaged in the review of administrative agency decisions is set out in N.C. Gen. Stat. § 150B-51(b), which provides that:

Except as provided in subsection (c) of this section, in reviewing a final decision, the court may affirm the decision of the agency or remand the case to the agency or to the administrative law judge for further proceedings. It may also reverse or modify the agency's decision, or adopt the administrative law judge's decision if the substantial rights of the petitioners may have been

prejudiced because the agency's findings, inferences, conclusions, or decisions are:

(1) In violation of constitutional provisions;

(2) In excess of the statutory authority or jurisdiction of the agency;

(3) Made upon unlawful procedure;

(4) Affected by other error of law;

(5) Unsupported by substantial evidence admissible under [N.C. Gen. Stat. §§] 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or

(6) Arbitrary, capricious, or an abuse of discretion.

However, N.C. Gen. Stat. § 150B-51(c) provides that:

> In reviewing a final decision in a contested case in which an administrative law judge made a decision, in accordance with [N.C. Gen. Stat. §] 150B-34(a), and the agency does not adopt the administrative law judge's decision, the court shall . . . not give deference to any prior decision made in the case and shall not be bound by the findings of fact or the conclusions of law contained in the agency's final decision. The court shall determine whether the petitioner is entitled to the relief sought in the petition, based upon its review of the official record. The court reviewing a final decision under this subsection may adopt the administrative law judge's decision; may adopt, reverse, or modify the agency's decision; may remand the case to the agency for further explanations under [N.C. Gen. Stat. §§] 150B-36(b1), 150B-36(b2), or 150B-36(b3), or reverse or modify the final decision for the agency's failure to provide the explanations; and make take any other action allowed by law.

Since the Board did not adopt the ALJ's decision in its Final Decision, N.C. Gen. Stat. § 150B-51(c) applies to this case. In cases governed by N.C. Gen. Stat. § 150B-51(c), "[t]he trial court's findings of fact should be upheld if supported by substantial evidence." *Corbett*, 190 N.C. App. at 119, 660 S.E.2d at 238 (citing *Ramsey v. N.C. Div. of Motor Vehicles*, 184 N.C. App. 713, 716, 647 S.E.2d 125, 127 (2007)). As a result of the fact that the trial court correctly recognized that this case was governed by N.C. Gen. Stat. § 150B-51(c) and "conducted a *de novo* review of the official record," our task on appeal in this case

is to determine whether the trial court properly applied the applicable standard of review.

### B. Substantive Legal Issues

### 1. Sufficiency of Trial Court's Findings of Fact

[1] Pursuant to N.C. Gen. Stat. § 150B-36(b), an agency making a final decision in a contested administrative proceeding, such as the one at issue here, "shall adopt each finding of fact contained in the administrative law judge's decision unless the finding is clearly contrary to the preponderance of the admissible evidence, giving due regard to the opportunity of the administrative law judge to evaluate the credibility of witnesses." N.C. Gen. Stat. § 150B-36(b). "For each finding of fact not adopted by the agency, the agency shall set forth separately and in detail" "[t]he reasons for not adopting the findings of fact" and "[t]he evidence in the record relied upon by the agency in not adopting the finding of fact contained in the administrative law judge's decision." N.C. Gen. Stat. § 150B-36(b1). "For each finding of fact that is not contained in the administrative law judge's decision, the agency shall set forth separately and in detail the evidence in the record relied upon by the agency in making the finding of fact," with "[a]ny new finding of fact made by the agency [to] be supported by a preponderance of the admissible evidence in the record." N.C. Gen. Stat. § 150B-36(b2). "Except as provided in N.C. Gen. Stat. § 150B-34(c), the agency shall adopt the decision of the administrative law judge unless the agency demonstrates that the decision of the administrative law judge is clearly contrary to the preponderance of the admissible evidence in the record" and "set[s] forth its reasoning for the decision in light of the findings of fact and conclusions of law in the final decision, including any exercise of discretion by the agency." N.C. Gen. Stat. § 150B-36(b3). On appeal, Petitioner contends that the Board violated N.C. Gen. Stat. §§ 150B-36(b1), (b2), and (b3) in a number of instances.[1] After care-

---

1. The trial court did not address Petitioner's challenges to the Board's failure to adopt various findings of fact made by the ALJ in its order. As a result of the fact that noncompliance with N.C. Gen. Stat. §§ 150B-36(b1), (b2), or (b3) would constitute a procedural error cognizable pursuant to N.C. Gen. Stat. § 150B-51(c), the trial court should have addressed Petitioner's challenges to the Board's compliance with these statutory provisions in its order. However, the trial court's failure to correctly apply the applicable "standard of review does not automatically necessitate remand, provided the appellate court can reasonably determine from the record whether petitioner's asserted grounds for challenging the agency's final decision warrant reversal or modification of that decision under the applicable provisions of" N.C. Gen. Stat. § 150B-51. *N.C. Dept. of Env't & Natural Res. v. Carroll*, 358 N.C. 649, 665, 599 S.E.2d 888, 898 (2004). Given that we are able to adequately review Petitioner's challenges to the

McCASKILL v. DEP'T OF STATE TREASURER

[204 N.C. App. 373 (2010)]

fully reviewing the Board's order, however, we are unable to conclude that it committed prejudicial error in failing to adopt certain of the administrative law judge's findings.[2]

First, Petitioner challenges the Board's rejection of Finding of Fact No. 29, in which the ALJ found that, "[i]n its December 17, 2004 letter to Petitioner's attorney, Mr. Barnes acknowledged that Respondent Division 'does not contest the actions that placed [Petitioner] on three-quarter time effective January 1, 2002;'" that "Respondent did not contest that Petitioner was an 'employee' as that term is defined in N.C. Gen. Stat. § 135-1(10) (2002);" and that "the validity of the settlement agreement and Petitioner's status as an 'employee' are not in dispute." The Board rejected Finding of Fact No. 29 because:

> it is not supported by the testimony presented and . . . it makes a conclusion as to the validity of the settlement agreement [that] is without support in the evidence. The ALJ found that "Respondent did not contest that Petitioner was an 'employee' as that term is defined . . . . (T pp. 131, 139) Thus, the validity of the settlement agreement and Petitioner's status as an 'employee" are not in dispute." The Board finds that the transcript pages referenced show that former Deputy Retirement Director Marshall Barnes testified that a person must be in a permanent full-time position to qualify for membership in the Retirement System, and the System did not dispute that Petitioner was initially reinstated to a permanent full-time position which would qualify for retirement service credit. The validity of the settlement agreement was in dispute in this case, however; the cited portions of the transcript make no reference to the validity or invalidity of that agreement.

Although Petitioner contends that the Board erred by concluding that the validity of the settlement agreement was in dispute, the validity of

Board's compliance with N.C. Gen. Stat. §§ 150B-36(b1), (b2), and (b3), we do not need to remand this case to the trial court for consideration of this aspect of Petitioner's challenge to the Board's decision.

2. In addition to his specific challenges to the Board's order, Petitioner argues that "the strident adversarial tone in the findings was entirely inappropriate" and that "its order seems to bristle at these independent findings in sweeping, argumentative and vehement language exhibiting a pervasive arbitrariness and prejudice against contrary facts which would undermine its predetermined result." Although the Board did use strong language in rejecting at least one of the administrative law judge's findings of fact, nothing in N.C. Gen. Stat. § 150B-51(c) or N.C. Gen. Stat. § 150B-52 suggests that the use of such language, standing alone, constitutes an independent basis for granting relief on appeal.

that agreement lies at the heart of the dispute between the parties. As a result, the Board did not err by declining to adopt Finding of Fact No. 29.

The ALJ found in Finding of Fact No. 30 that:

> Respondent contended that the retirement contributions detailed in the settlement agreement between DHHS and Petitioner were not an approved method for Petitioner to receive retirement service credit with Respondent. At [the] hearing, Mr. Barnes explained that Respondent did not accept Petitioner's settlement agreement, because:
>
>> Petitioner did not have enough sick leave and vacation leave to get him to five years by exhausting that continuously, then there would have been a problem, but there was an inherent manipulation here to play the system to get him . . . to qualify him for the benefit.

The Board declined to accept Finding of Fact No. 30 because it "misquotes the testimony of Mr. Barnes and otherwise misrepresents the testimony of the witness." Instead, the Board found that "the Retirement System determined that the settlement agreement was ineffective to provide Petitioner with five years of membership service, not because it was 'not an approved method for Petitioner to receive retirement credit with Respondent' but because it was contrary to statute." Although Petitioner contends that the Board mischaracterized Mr. Barnes' testimony, the record reflects that Mr. Barnes testified that, if Petitioner had had sufficient "sick leave and vacation leave to get him to five years by exhausting that continuously, then there would not have been a problem," and that the settlement agreement did not provide Petitioner with five years of membership service because it was contrary to statute. As a result, we do not believe that the Board erred by declining to adopt the ALJ's Finding of Fact No. 30.

The ALJ found in Finding of Fact No. 31 that "Barnes also acknowledged that the personnel policies have changed over time, and he didn't know exactly what the policy was, that was in effect at that time [2001-2002]." The Board declined to adopt Finding of Fact No. 31 because "it is irrelevant whether Barnes knew or did not know what personnel policies were in effect in 2001-02." Although Petitioner argues that the Board lacked the authority to reject a finding of fact on relevance grounds and contends that credibility determinations are the province of the ALJ rather than the agency, we see

no reason why an agency may not reject a factual finding as irrelevant, particularly where, as here, the contents of the applicable personnel policy and the date upon which it became effective are not in doubt. Furthermore, we do not believe that the Board's decision to reject Finding of Fact No. 31 as irrelevant involved any sort of impermissible credibility determination. Thus, we do not believe that the Board erred by rejecting Finding of Fact No. 31.

The ALJ found in Finding of Fact No. 33 that:

According to Mr. Barnes, there was no verification in Petitioner's member file that DHHS or Petitioner had consulted Respondent about the settlement agreement before Petitioner and DHHS executed that agreement. Barnes did not find a copy of the settlement agreement between Petitioner and DHHS in Petitioner's member record when he received Petitioner's attorney['s] November 7, 2003 letter. (T pp. 105, 119) As a result, Barnes explained that he did not give prior approval to the agreement or talk with anyone at DHHS about the proposed settlement agreement. (T p 107) However, Barnes' testimony is inconsistent with his December 17, 2004 letter to Petitioner's attorney when he wrote:

I have received Mr. McCaskill's member record and find that the first copy of the settlement agreement we received was received after it was executed by all parties and was received on July 8, 2002.

(R Ex 6, p 2) Additionally, Barnes opined that had the parties asked him to approve the subject agreement, he would not have approved such an agreement. (T-1, pp. 107-08, 118, 126)

The Board rejected Finding of Fact No. 33 "on the basis that it misrepresents the entirety of the oral and written evidence provided at the hearing." According to the Board, Barnes testified on four different occasions that he first saw the settlement agreement at the time that he received a letter from Petitioner's counsel in November, 2003. On the other hand, the Board noted that "[n]either counsel for the Petitioner, counsel for Respondent, nor the ALJ questioned Barnes about the discrepant date in the letter or provided Barnes any opportunity to explain the 2002 date" and that "Petitioner presented no evidence that the agreement had been submitted prior to November 2003." For that reason, the Board found "that the evidence presented at the hearing was overwhelming and clear and that the first time the

settlement agreement was submitted to the Retirement System was in November 2003." Although Petitioner argues that the Board failed to give deference to the ALJ's credibility determination, the Board made a finding that was tantamount to the required determination that the ALJ's decision was contrary "to the preponderance of the admissible evidence." N.C. Gen. Stat. § 150B-36(b1). As a result, we do not believe that the Board erred by failing to adopt the ALJ's Finding of Fact No. 33.

The Board also declined to adopt the ALJ's Finding of Fact Nos. 34 and 36, which provided that:

34. A preponderance of the evidence established that since at least 1982, Respondent's practice is to grant a member a full month retirement credit for any part of the month in which the member works, and for which retirement contributions are made. Respondent authorizes this practice, although there is no statute or administrative rule which provides for such a practice.

. . . .

36. In June/July of 2002, when Petitioner and DHHS signed its settlement agreement, N.C. Gen. Stat. § 135-4(v) allowed a member of the Retirement System, who had been terminated from a covered position and later reinstated, to purchase credit for omitted service. The cost to purchase the omitted service varied depending on whether the service was purchased within 90 days of the omission, after 90 days but prior to three years, or after three years. Neither DHHS nor Petitioner requested Respondent provide, pursuant to N.C. Gen. Stat. § 135-4(v), the cost to purchase the omitted service in Petitioner's case. (T-1, pp. 105, 140) Barnes explained that Respondent interpreted the retirement provisions so that in 2002, N.C. Gen. Stat. § 135-4(v) was the only statutory provision under which Petitioner could purchase retirement service.

The Board rejected Finding of Fact No. 34 as "an incomplete statement of the Retirement System's practice" and found that "the Retirement System's practice of awarding a full month of retirement credit for any part of a month worked has been applied mainly to a member's first month of employment and last month of employment prior to retirement and would not apply, e.g., to employees who worked in a job-sharing arrangement so as to award full-time credit for half-time work." Similarly, the Board rejected Finding of Fact No. 36 "on the grounds that it is an inexact summary of N.C. [Gen. Stat.]

§ 135-4(v) as well as an incomplete summary of the testimony provided." Instead, the Board found that "the statute referenced provides for the purchase of 'omitted membership service,' but makes no reference to termination or reinstatement, and that this statute was the only statutory provision in effect at the time of Petitioner's reinstatement which provided for the purchase of retroactive membership service." Although Petitioner contends that the Board erred in rejecting Finding of Fact Nos. 34 and 36 on the theory that there is no statutory basis for rejecting factual findings made by an ALJ for "incompleteness," we believe that a materially and misleadingly "incomplete" finding is inherently erroneous. Furthermore, Petitioner has not shown any error in the substitute findings that the Board adopted. Thus, the Board did not err by rejecting Finding of Fact Nos. 34 and 36.

The ALJ found, based on testimony from Mr. Barnes, in Finding of Fact No. 37 that, "[a]ccording to state personnel records, Petitioner was a contributing employee for 60 consecutive months." The Board rejected Finding of Fact No. 37 because it "ha[d] no support in the evidence" given that "Barnes was not asked to testify regarding records maintained by the Office of State Personnel" and given that Petitioner was unable to obtain the introduction into evidence of "certain state personnel records" "due to the lack of any witness who could testify as to what information they contained." Although Petitioner contends that there was ample record support for the ALJ's initial finding, the record reflects that Mr. Barnes was not ever asked to testify concerning records maintained by the Office of State Personnel and that an objection to the admission of certain state personnel records was sustained for the reason stated by the Board. Moreover, even if State Personnel records stating that Petitioner had 60 months of continuous service had been admitted into evidence, we cannot see how the existence of such records would be determinative given the undisputed evidence concerning the dates and times that Petitioner took paid and unpaid leave after 6 December 2001. As a result, we are unable to conclude that the Board committed prejudicial error by rejecting Finding of Fact No. 37.

In Finding of Fact No. 38, the ALJ found, based on testimony by Mr. Guy, that, "[a]ccording to DHHS records, Petitioner was a contributing employee for 60 consecutive months." The Board rejected Finding of Fact No. 38 on the grounds that "such a finding has no support in the evidence" since "Mr. Guy did not testify as to any records which purportedly showed Petitioner to be a contributing employee

for 60 months." Although Petitioner pointed to testimony in which Mr. Guy indicated that he believed that "retirement contributions were being withheld from what [Petitioner] was being paid during those months" and that "the DHHS records as to the disputed months were made part of the record" and referenced during Mr. Guy's testimony, he does not identify any admissible evidence indicating that DHHS records demonstrated that he "was a contributing employee for 60 consecutive months." Moreover, even if such records had been introduced, the existence of such evidence would not establish Petitioner's eligibility for long-term disability coverage given the undisputed nature of the evidence bearing on the number of days that he took paid and unpaid leave after 6 December 2001. Thus, the Board did not commit prejudicial error by rejecting Finding of Fact No. 38.

In Finding of Fact No. 39, the ALJ found that:

DHHS did not submit Petitioner's settlement agreement to [the Office of State Personnel] for approval, because Guy believed that Section 7, page 45 of the State Personnel Manual did not require OSP's approval in this instance. Specifically, he relied upon the following statement from the Manual: "This provision shall also not be construed to require approval of any settlement, the terms of which allow an employee to substitute a resignation for a dismissal and to withdraw a grievance or a contested case action." (p. 180)

The Board rejected Finding of Fact No. 39 as "an incomplete and misleading statement of the evidence presented." Although the Board agreed that Mr. Guy had testified that he did not seek approval of the settlement agreement based upon the provision of the State Personnel Manual quoted above, it found "that the agreement went considerably beyond having Petitioner substitute a resignation for a dismissal and withdrawing his grievance by: (1) purporting to reinstate Petitioner to his former position; (2) reallocating his position from forty hours per week to thirty hours per week; and (3) attempting to show that Petitioner alternated between pay status and pay without leave status for a portion of each month from January through August, 2002." The Board further found that "such an agreement was required to be reviewed and approved by OSP, as provided in 25 N.C.A.C. 1B.0436 and confirmed by the testimony of Drake Maynard." Petitioner contends that the Board erred in rejecting Finding of Fact No. 39 because the disputed finding "is an accurate representation of Guy's testimony," because Mr. Maynard never ad-

dressed the extent to which the settlement agreement had to be submitted to OSP for approval, and because the Board's disagreement with Mr. Guy's position does not constitute a valid basis for rejecting the ALJ's finding. Despite the Board's decision to reject Finding of Fact No. 39, the Board clearly confirmed the ALJ's determination that Mr. Guy did not submit the settlement agreement for OSP approval based upon the provisions of Section 7 of the State Personnel Manual. Furthermore, Petitioner does not appear to dispute the accuracy of the Board's additional findings describing the way in which the present settlement agreement differed from one which merely substituted a resignation for a termination. Finally, as Petitioner himself notes, the extent to which the settlement agreement actually had to receive OSP approval is a question of law rather than a question of fact. Thus, the Board did not err by rejecting the ALJ's Finding of Fact No. 39.

The ALJ found in Finding of Fact No. 40 that:

A preponderance of the evidence at [the] hearing proved that DHHS and Petitioner signed their settlement agreement in good faith, believing their agreement resolved Petitioner's internal grievance with DHHS, and complied with North Carolina personnel and retirement statutes, rules and regulations. Petitioner relied on the assurances of the DHHS employees and agents, and his attorney, regarding the validity of the settlement agreement. Based on such reliance, Petitioner released any and all claims against DHHS regarding Petitioner's December 6, 2001 termination.

The Board rejected Finding of Fact No. 40 as "incomplete, misleading, and contrary to the preponderance of the evidence."

Rather than showing that Petitioner and DHHS entered into the agreement in good faith that they were complying with all personnel and retirement statutes and rules, the Board finds from the preponderance of the evidence that Petitioner and DHHS entered into their agreement with disregard for personnel or retirement statutes and rules. Where either of the parties could have consulted with the Retirement System concerning the retirement issues raised by the agreed-on settlement prior to the agreement, the Board finds that neither party did so. While State Personnel rules required a settlement agreement such as the one at issue to be reviewed and approved by the State Personnel Director, according to [the] testimony of the relevant witness, the

Board finds that neither party submitted the agreement to OSP. And finally, where the agreement fictitiously placed Petitioner on alternating periods of paid leave and leave without pay, all in an attempt to manipulate Petitioner's records to make it appear that he qualified for State disability benefits when he in fact did not, the Board rejects any suggestion that the parties to the agreement acted in good faith that their scheme was in compliance with applicable laws.

Although Petitioner contends that the record shows that all parties thought that the settlement agreement had been approved or was acceptable to the Retirement System and that the record was devoid of any evidence tending to show that any party acted in bad faith, the undisputed evidence establishes that no party sought or obtained approval of the settlement agreement prior to its execution. Furthermore, although we might have chosen different words, the Board's conclusion that the parties to the settlement agreement were attempting to "manipulate" the Retirement System in an attempt to settle their dispute was a legitimate inference from the undisputed evidence that the parties had not consulted with or obtained approval from the Retirement System prior to entering into the settlement agreement. As a result, the Board did not err by rejecting Finding of Fact No. 40.

Finally, the ALJ found in Finding of Fact No. 41 that "[a] preponderance of the evidence showed that Respondent accepted DHHS retirement contributions on Petitioner's behalf, and never returned those contributions to Petitioner" and that Petitioner "relied on Respondent's acceptance of those retirement contributions, although after the agreement's execution as verification, that the settlement agreement between Petitioner and his employer had been approved by Respondent." The Board rejected Finding of Fact No. 41 on the grounds "that it is incomplete, misleading, irrelevant and contrary to the preponderance of the evidence." According to the Board, "DHHS submitted to the Retirement System a percentage of the salary it paid to Petitioner, just as it routinely does for all of its other employees and as required by statute," so that "[t]he issue is not whether DHHS paid and the Retirement System accepted the contributions, but whether the 72 days of leave for which Petitioner was paid could be counted as nine months of service." Although Petitioner contends, once again, that there is no statutory basis for rejecting a finding of fact on relevance grounds and that the Board failed to explain its reason for finding that Finding of Fact No. 41 was contrary to the pre-

ponderance of the evidence, we see no obstacle to the rejection of a finding on relevance grounds or any basis for believing that the information contained in Finding of Fact No. 41 is relevant to the ultimate issue before the Board. Moreover, Petitioner has not pointed to any portion of the record demonstrating his reliance on the Retirement System's acceptance of the contribution payment made on his behalf as an endorsement of the validity of the settlement agreement. As a result, the Board did not err by rejecting Finding of Fact No. 41.

Thus, for the reasons set forth above, we do not believe that the Board erred by failing to adopt certain of the ALJ's findings of fact. Given that fact and the fact that Petitioner has not challenged the adequacy of the record support for the factual findings made by the trial court pursuant to N.C. Gen. Stat. § 150B-51(c), we are in a position to evaluate the appropriateness of the manner in which the trial court resolved the legal issues raised by Petitioner's appeal from the Board's decision.

### 2.  Eligibility for Long-Term Disability Benefits

[2] The initial substantive legal issue raised by Petitioner's appeal is the extent to which the arrangement worked by the settlement agreement suffices to render Petitioner eligible for long-term disability benefits under the N.C. Gen. Stat. § 135-106(a). After careful consideration of the record in light of the applicable law, we conclude that the trial court correctly determined that the settlement agreement did not provide Petitioner with sufficient "membership service" to render him eligible to receive such benefits.

According to N.C. Gen. Stat. § 135-106(a), "any beneficiary or participant who has had five or more years of membership service may receive long-term disability benefits from the Plan upon approval by the Board of Trustees[.]"

> As to the requirement of five years of membership service, any participant or beneficiary who does not have five years of membership service within the 96 calendar months prior to conclusion of the short-term disability period or cessation of salary continuation payments, whichever is later, shall not be eligible for long-term disability benefits.

N.C. Gen. Stat. § 135-106(a). "[M]embership service" is defined as "service as a teacher or State employee rendered while a member of the Retirement System." N.C. Gen. Stat. § 135-1(14). The "members" of the State Teachers' and Employees' Retirement System include

"any teacher or State employee included in the membership of the System . . . ." N.C. Gen. Stat. § 135-1(13). "Service" is defined as "service as a teacher or State employee . . . ." N.C. Gen. Stat. § 135-101(17). Although the parties agree that Petitioner was a "member" of the Retirement System and that his sick and vacation leave time counts toward the calculation of his "membership service," they disagree about the extent to which he is entitled to credit toward the five year "membership service" requirement for the time he was on leave without pay between 6 December 2001 and 9 September 2002. As a result, the ultimate issue which we must confront in this case is the extent to which the term "membership service" used in N.C. Gen. Stat. § 135-106(a) includes periods of leave without pay. In other words, we face an issue of statutory construction.

"The principal goal of statutory construction is to accomplish the legislative intent." *Lenox, Inc. v. Tolson*, 353 N.C. 659, 664, 548 S.E.2d 513, 517 (2001) (citing *Polaroid Corp. v. Offerman*, 349 N.C. 290, 297, 507 S.E.2d 284, 290 (1998)). "The best indicia of that intent are the language of the statute . . ., the spirit of the act and what the act seeks to accomplish." *Concrete Co. v. Board of Commissioners*, 299 N.C. 620, 629, 265 S.E.2d 379, 385 (1980). "The interpretation of a statute given by the agency charged with carrying it out is entitled to great weight." *Frye Reg'l Med. Ctr. v. Hunt*, 350 N.C. 39, 45, 510 S.E.2d 159, 163 (1999) (citing *High Rock Lake Assoc. v. Environmental Management Comm.*, 51 N.C. App. 275, 279, 276 S.E.2d 472, 475 (1981)).

Petitioner argues that, since "[p]eriods of leave without pay do not constitute a break in service," 25 N.C.A.C. 1D.0114, he was a full time DHHS employee for 60 continuous months, thus meeting the five year "membership service" requirement. In Petitioner's opinion, the Retirement System's insistence that he exhaust his sick and vacation leave on a continuous basis lacked any specific statutory support and was, therefore, "arbitrary, capricious, unauthorized, unconstitutional, and contrary to the intent of the General Assembly." Furthermore, Petitioner argues that neither N.C. Gen. Stat. § 135-4(b), (h), and (v), 25 N.C.A.C. 1E.1112, nor 25 N.C.A.C. 1B.0436 rendered the provisions of the settlement agreement ineffective because N.C. Gen. Stat. § 135-4(b) addresses sharing leave among two employees occupying the same position; N.C. Gen. Stat. § 135-4(h) appears to address leaves of absence lasting longer than one month; N.C. Gen. Stat. § 135-4(v) says nothing about the need for continuous leave exhaustion; 25 N.C.A.C. 1E.1112 "does not say that the use of short

term leave without pay is expressly limited to only those times where an employee has no leave credits;" and 25 N.C.A.C. 1B.0436 did not require prior approval of the present settlement agreement because it involved the substitution of a resignation for a termination notice. As a result, Petitioner argues that, given the absence of any statutory provision or regulation that directly prohibits implementation of the arrangement embodied in the settlement agreement, he is eligible for long-term disability benefits. Our dissenting colleague essentially adopts Petitioner's arguments.

The Retirement System, on the other hand, contends, in reliance on *Worrell v. N.C. Department of State Treasurer*, 333 N.C. 528, 427 S.E.2d 871 (1993), that the definition of "membership service" should be strictly construed and that retirement credit should be deemed available "at all times that [the employee] was working." *Wiebenson v. Bd. of Trustees, State Employees' Ret. Sys.*, 345 N.C. 734, 739, 483 S.E.2d 153, 155 (1997). The Retirement System contends that its decision to deny Petitioner credit for times when he was on leave without pay was fully "consistent with the statutory provisions that govern the accrual of creditable service." According to the Retirement System, the only statutory provision that would have authorized any sort of retroactive crediting of "membership service" to Petitioner was N.C. Gen. Stat. § 135-4(v), under which a reinstated employee was treated "as though [he or she] had remained continuously employed." In addition, the Retirement System notes that N.C. Gen. Stat. § 135-4(b) provides that "in no case shall more than one year of service be creditable for all services in one year," so that "a school employee in a job-sharing position [would] be credited at the rate of one-half year for each regular school year of employment," and that N.C. Gen. Stat. § 135-4(h) provides that, "when a member is on leave of absence and receiving less than his full compensation, he will be deemed to be in service only if he is contributing to the Retirement System as provided in [N.C. Gen. Stat. §] 135-8(b)(5)." As a result, the Retirement System argues that the trial court correctly concluded that "the overriding intent of the legislature [is] that one day of work equate to one day of retirement credit."

After carefully studying the record, the relevant statutory provisions, and the pertinent regulations, we conclude that the General Assembly did not contemplate awarding long-term disability benefits in situations like the one that confronts us in this case. As part of the process of reaching this determination, we believe that it is important to identify the issue which this Court has been called upon to resolve.

McCASKILL v. DEP'T OF STATE TREASURER

[204 N.C. App. 373 (2010)]

Petitioner has essentially assumed that, in the absence of some specific statutory provision or regulation prohibiting the arrangement adopted in the settlement agreement, the approach adopted in that document is lawful. Our dissenting colleague appears to concur in this approach. We are simply unable to agree that Petitioner has correctly identified the question that we are required to address. Since the ultimate issue is the proper definition of a statutory term, we believe, as we have already indicated, that the relevant question is whether, using traditional standards of statutory construction, "membership service" as that term is utilized in N.C. Gen. Stat. § 135-106(a) includes periods during which a "member" has leave without pay status. Thus, we believe that the Petitioner has used an incorrect standard in seeking reversal of the trial court's decision.

In construing relevant statutory provision, we believe that a number of factors tend to support the trial court's determination that "Petitioner did not have five years of membership service as a result of the July 2002 settlement agreement with the DHHS." First, as the Retirement System notes, the overriding theme of both the relevant statutory provisions and the *Wiebenson* decision of the Supreme Court is that, generally speaking, an employee gets a day's credit for a day's work.[3] Although Petitioner is certainly correct in pointing out that neither N.C. Gen. Stat. § 135-4(b) nor N.C. Gen. Stat. § 135-4(h) have any direct application to the present case, they both clearly indicate that the General Assembly understood that "membership service" credit would generally be awarded on a day-for-day basis. Such thinking clearly underlies the *Wiebenson* decision, which adopts the Solomonic approach of dividing the amount of retirement credit available for the occupants of a shared position equally among the two occupants, implicitly suggesting that employees should get a day's credit for a day's work.[4]

_____

3. Although our dissenting colleague contends that our "day's credit for a day's work" approach is inconsistent with existing Retirement System practice of granting employees a full month's credit for the first and last month in which an employee is employed, we note that the validity of that practice is not at issue in this case and that we express no opinion about the extent to which limited exceptions to the test outlined above may be appropriate. The approach advocated by Petitioner requires acceptance of a wholesale abandonment of the "day's credit for a day's work" approach we believe to be inherent in the relevant statutory provisions and in *Wiebenson*.

4. Petitioner cites *Wiebenson*, 345 N.C. at 738-39, 483 S.E.2d at 155, for the proposition that ""[f]ull time employees who are on approved leave without pay are considered full time employees." In addition, Petitioner cites 25 N.C.A.C. 1D.0114, which provides, in pertinent part, that "[p]eriods of leave without pay do not constitute a break in service"). Based upon this authority, Petitioner argues that he does, in fact, have the necessary "membership service" to qualify for long-term disability benefits since he

Secondly, the day-for-day credit approach implicit in these statutory provisions and in the Supreme Court's decision in *Wiebenson* is also consistent with considerations of sound policy, in that it discourages attempts to manipulate the rules governing eligibility for long-term disability benefits and other benefits administered by the Retirement System in favor of a simple, easy to understand, intuitively obvious approach to the determination of the amount of "membership service" that a particular state employee has accumulated. According to a well-established principle of statutory construction, "courts normally adopt an interpretation which will avoid absurd or bizarre consequences, the presumption being that the legislature acted in accordance with reason and common sense and did not intend untoward results." *State v. Jones*, 359 N.C. 832, 838-39, 616 S.E.2d 496, 499 (2005) (quoting *Comr. of Insurance v. Automobile Rate Office*, 294 N.C. 60, 68, 241 S.E.2d 324, 329 (1978)). The effect of construing "membership service" to include leaves without pay will be to encourage more settlements of the type at issue here, an outcome which the Court should not facilitate given the uncertain effect of large numbers of such arrangements upon the economic status of the Retirement System.

Thirdly, we do not believe that the provisions of the settlement agreement are consistent with the relevant personnel rules governing the availability of short leave without pay. The "[v]arious types of leave recognized by the State Personnel Commission . . . [include] vacation leave, sick leave, worker's compensation leave, military leave, holidays, miscellaneous leave, voluntary shared leave, family and medical leave, community service leave, and leave without pay." 25 N.C.A.C. 1E.0102. The settlement agreement specifically provided that the days "for which [Petitioner] does not have sufficient sick or vacation leave will be equally apportioned to each month during this period and treated as leave without pay." Although "[l]eave without pay may be granted to a full-time or part-time permanent, trainee, or probationary employee for illness, educational purposes, vacation, or for any other reasons deemed justified by the agency head[,]" 25

---

was a full-time employee for sixty continuous months. The fact that an individual on leave does not have a break in service and remains a full-time employee does not, however, mean that the employee is entitled to "membership service" credit for periods when he or she does not actually work. In fact, as is discussed more fully in the text, the actual decision in *Wiebenson* contains a contrary suggestion, indicating that each of two full-time employees that shared a single position were entitled to half a year's retirement credit instead of a full year's credit. As a result, the absence of a "break in service" is not the same thing as continued "membership service" as defined in N.C. Gen. Stat. § 135-106(a).

N.C.A.C. 1E.1101, uncategorized unpaid leave appears to be divided into extended leave without pay, which is defined as "leave in excess of one-half the workdays in the pay period," 25 N.C.A.C. 1E.1111, and short leave without pay, which is defined as "leave for less than one-half the workdays [in the] pay period."[5] 25 N.C.A.C. 1E.1112. A comparison of the number of workdays in the relevant months to the number of sick and vacation leave days exhausted in those months makes it clear that Petitioner exhausted sick and vacation leave for slightly more than half of the work days in each month from January 1, 2002, through September 6, 2002. As a result, under the applicable regulation, and as the trial court clearly found, Petitioner was on short leave without pay on those days that he was not exhausting sick or vacation leave. However, 25 N.C.A.C. 1E.1112 expressly provides that short leave without pay "is used to account for time that an employee is absent and has no accumulated or advanced leave credits." Since Petitioner had unexhausted sick and vacation leave throughout the period from January 1, 2002, through September 6, 2002, he was not eligible under the express language of 25 N.C.A.C. 1E.1112 to receive short leave without pay.[6] As a result, under the applicable State Personnel regulations, Petitioner was not entitled to receive a series of short leaves without pay. Thus, this inconsistency between the applicable State Personnel regulations and the provisions of the settlement agreement provides further confirmation that "membership service" for purposes of determining eligibility for long-term disability benefits does not include periods when an employee is on unpaid leave.

The parties spent considerable time in their briefs debating the impact of N.C. Gen. Stat. § 135-4(v) as it existed at the time that this controversy developed and 25 N.C.A.C. 1B.0436 on the proper resolu-

_____

5. Petitioner and our dissenting colleague argue that 25 N.C.A.C. 1E.1101 allows for other types of leave without pay in addition to extended leave without pay and short leave without pay. However, such an interpretation is inconsistent with the structure of the relevant State Personnel regulations. In those regulations, 25 N.C.A.C. 1E.1101 is expressly labeled as a statement of policy, with extended leave without pay as defined in 25 N.C.A.C. 1E.1111 and short leave without pay as defined in 25 N.C.A.C. 1E.1112 covering all the applicable possibilities in terms of the length of leaves without pay. As a result, we do not believe that the State Personnel regulations treat 25 N.C.A.C. 1E.1101 as creating a third type of leave without pay separate and apart from extended leave without pay and short leave without pay.

6. Although Petitioner argues that 25 N.C.A.C. 1E.1112 does not expressly limit the availability of short leave without pay to situations where the employee lacks unexhausted sick or vacation leave, this argument ignores the plain language of the regulation. We are unable to understand how short leave without pay can be expressly made available for a particular purpose and yet be available in other instances.

tion of this case. After carefully studying the relevant version of N.C. Gen. Stat. § 135-4(v), we do not find that it provides much assistance in interpreting N.C. Gen. Stat. § 135-106(a). To that extent, we are unable to concur in the trial court's conclusion that this statutory provision "necessarily require[s]" that a reinstated employee who is exhausting leave do so "on a continuous basis." On the other hand, given the numerous other bases for construing "membership service" to exclude unpaid leave, we do not believe that our disagreement with the trial court's conclusion that N.C. Gen. Stat. § 135-4(v) requires continuous exhaustion of paid leave necessitates an award of appellate relief.

Finally, we agree with the trial court's conclusion that 25 N.C.A.C. 1B.0436 required the submission of the settlement agreement to the Office of State Personnel for approval, given that the "settlement agreement went considerably beyond merely allowing Petitioner to substitute his resignation for his dismissal and the withdrawal of the agreement." The simple fact of the matter is that DHHS was not entitled to provide Petitioner with binding assurances that the Retirement System would accept the approach adopted in the settlement agreement; the fact that the relevant DHHS officials were unaware of this requirement does not render the contract any less binding. Had Petitioner and DHHS taken the time to consult with the Office of State Personnel and the Retirement System prior to executing the settlement agreement, the present controversy could have been avoided.

Thus, for the reasons set forth above, we believe that the trial court correctly determined that only sick and vacation leave days could be counted toward the calculation of Petitioner's "membership service" and that the periods during which Petitioner was on leave without pay should be excluded from the calculation of Petitioner's "membership service." As a result, we affirm the trial court's conclusion that, under the applicable statutory provisions, Petitioner did not have sufficient membership service to be entitled to long-term disability benefits.

### 3.  Retirement System Not Bound by DHHS Contract

[3]  Even if he is not entitled to long-term disability benefits based on a proper application of the relevant statutory provisions and regulations, Petitioner contends that the settlement agreement represents a valid contract entered into between a state agency and an individual that is binding upon all agencies of state government, including the

Retirement System. As a result, Petitioner contends that he is entitled to enforce the settlement agreement against the Retirement System regardless of his eligibility for such benefits under a strict application of N.C. Gen. Stat. § 135-106(a).

Although there is no question that the State is bound by its contracts, it "is liable only upon contracts authorized by law." *Smith v. State*, 289 N.C. 303, 322, 222 S.E.2d 412, 425 (1976) (emphasis added). Petitioner has not cited any authority in support of his implicit contention that the Secretary of DHHS is entitled to award membership service in the Retirement System, and we know of none. For that reason, the mere fact that Petitioner and DHHS entered into a contract that both parties hoped would render Petitioner eligible to receive long-term disability benefits does not automatically entitle him to receive such benefits. As a result, Petitioner is only eligible for long-term disability benefits to the extent that he qualifies for them under otherwise applicable law. Any other conclusion would allow state agencies to settle controversies with their employees or others without regard to their impact on other agencies or on state government at large. Our dissenting colleague does not seem to disagree with this fundamental proposition, since the argument advanced in the dissent with respect to this issue assumes that the settlement agreement operated to make Petitioner eligible for long-term disability benefits. Since we have already explained the reason that the arrangement set out in the settlement agreement did not render Petitioner eligible for long-term disability benefits, the status of the settlement agreement as an otherwise valid contract between Petitioner and DHHS does not change our view of the proper outcome of this case.[7]

### 4. Estoppel and Quasi-Estoppel

[4] Finally, Petitioner contends that the Retirement System is estopped from denying his claim for long-term disability benefits and that the trial court erred by concluding that "[n]either the elements of estoppel nor quasi-estoppel are present in this case." We disagree.

> [T]he essential elements of an equitable estoppel as related to the party estopped are: (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is

---

7. The dissent also notes that Petitioner gave up the right to contest his discharge in return for DHHS' willingness to enter in the settlement agreement. Although we recognize that Petitioner attempted to obtain certain benefits through the settlement agreement, we believe that any disability benefits made available through that mechanism have to be obtained in a manner that is consistent with existing laws governing eligibility for such benefits.

reasonably calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party afterwards attempts to assert; (2) intention or expectation that such conduct shall be acted on by the other party, or conduct which at least is calculated to induce a reasonably prudent person to believe such conduct was intended or expected to be relied and acted upon; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, they are: (1) lack of knowledge and the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party sought to be estopped; and (3) action based thereon of such a character as to change its position prejudicially.

*Hawkins v. Finance Corp.*, 238 N.C. 174, 177-78, 77 S.E.2d 669, 672 (1953). The doctrine of quasi-estoppel differs from the doctrine of equitable estoppel in that the former "has its basis in the acceptance of benefits" and exists "where one having the right to accept or reject a transaction or instrument takes and retains benefits thereunder, . . . ratifies it, and cannot avoid its obligation or effect by taking a position inconsistent with it." *Redevelopment Comm. v. Hannaford*, 29 N.C. App. 1, 4, 222 S.E.2d 752, 754 (1976). Although "a governmental agency is not subject to an estoppel to the same extent as a private individual or a private corporation[,]" " 'an estoppel may arise against a [governmental entity] out of a transaction in which it acted in a governmental capacity, if an estoppel is necessary to prevent loss to another, and if such estoppel will not impair the exercise of the governmental powers of the [entity].' " *Fike v. Bd. of Trustees*, 53 N.C. App. 78, 81-82, 279 SE.2d 910, 913 (1981). According to Petitioner and our dissenting colleague, the fact that DHHS personnel responsible for implementing and ensuring compliance with Retirement System rules informed Petitioner and other DHHS officials that the proposed settlement agreement was in compliance with applicable Retirement System rules, *Fike*, 53 N.C. App. at 80-82, 279 S.E.2d at 912-13 (holding that the Retirement System was estopped from denying retirement benefits where plaintiff followed procedures established by the Retirement System in applying for disability retirement benefits and relied upon his retirement officer's assurances that he had done all that needed to be done in order to properly apply for the benefits in question), and the fact that the Retirement System accepted the contributions transmitted from DHHS on Petitioner's behalf, *Wiebenson v. Board of Trustees*, 123 N.C. App. 246, 250, 472 S.E.2d 592, 595 (1996), *modified and affirmed*, 345 N.C. 734, 483 S.E.2d 153 (1997)

McCASKILL v. DEP'T OF STATE TREASURER

[204 N.C. App. 373 (2010)]

(holding that the fact that the Retirement System accepted petitioner's contributions and provided "yearly statements . . . to petitioner for each year from 1985 through 1990 which indicated that she was continuing to accumulate retirement credit in the Retirement System" constituted a ratification of representations by an agency employee who purported to be the Retirement System's agent to the effect that the petitioner "was still a participating member of the Retirement System"), suffices to preclude the Retirement System from denying Petitioner's claim for long-term disability benefits.[8]

The trial court's findings of fact, which Petitioner has not challenged on appeal, do not provide any indication that anyone from DHHS contacted the Retirement System or obtained the Retirement System's approval prior to the date upon which the settlement agreement was executed. The failure of the parties to the settlement agreement to submit the settlement agreement for approval by the Office of State Personnel as required by 25 N.C.A.C. 1B.0436 or consult with the Retirement System precluded anyone from justifiably relying on the beliefs of the relevant DHHS officials that the approach adopted in that agreement would pass muster with the Retirement System. The unique nature of the settlement agreement coupled with the absence of any review by the Office of State Personnel or the Retirement System precluded anyone at DHHS from claiming to have any clear understanding of how that document would be treated by the Retirement System or from having any confidence that the settlement agreement was lawful. Although the Retirement System accepted payments made by DHHS on Petitioner's behalf, the trial court found that the Retirement System "had no knowledge of the real facts until well after the settlement agreement had been made." In addition, unlike the situation in *Wiebenson*, where the Retirement System accepted the employee's contributions and sent statements to the employee indicating that the employee was a participating member for a five year period, the Retirement System rejected Petitioner's

---

8. In addition, Petitioner contends that the administrative law judge erred by excluding testimony from his attorney that his attorney and Ms. Hollers, a DHHS employee, were involved in a three-way conversation with a Retirement System employee (whose name Petitioner's attorney could not recall) in which the unknown Retirement System employee assured Petitioner's attorney and Ms. Hollers that the arrangement embodied in the settlement agreement would work. However, the record does not reflect that Petitioner properly exhausted his administrative remedies with respect to this issue or assigned the administrative law judge's ruling as error. *See, e.g., State ex rel. Utilities Comm. v. Carolina Water Service, of North Carolina*, 335 N.C. 493, 498-500, 439 S.E.2d 127, 130-31 (1994); N.C.R. App. 10(a). As a result, Petitioner's challenge to the administrative law judge's ruling is not properly before us on appeal.

McCASKILL v. DEP'T OF STATE TREASURER

[204 N.C. App. 373 (2010)]

application for disability benefits during the course of evaluating his initial application. The record is totally devoid of any indication that the Retirement System made any misrepresentation to Petitioner or did anything whatsoever that would have suggested to Petitioner that the Retirement System would honor the arrangement embodied in the settlement agreement. Finally, unlike the situation at issue in *Fike*, there is no indication that Petitioner relied on anything that the Retirement System did or said in deciding to enter into the settlement agreement, and, unlike the situation in *Wiebenson*, there is no indication that the Retirement System acted consistently with Petitioner's expectations over a period of years so as to ratify the actions of the relevant DHHS officials. As a result, the trial court appropriately concluded that "[n]either the elements of estoppel nor quasi-estoppel are present in this case."

### III. Conclusion

For the reasons stated above, we believe that the trial court correctly determined that Petitioner had not, despite the provisions of the settlement agreement, accumulated five years of membership service under and was not, for that reason, eligible for long-term disability benefits. In addition, we conclude that the trial court correctly rejected Petitioner's other challenges to the Board's decision and that its failure to address Petitioner's challenges to the Board's rejection of certain of the ALJ's findings of fact does not necessitate an award of appellate relief. As a result, we affirm the trial court's order upholding the Board's Final Decision denying Petitioner's request for such benefits.

Affirmed.

Judge BRYANT concurs.

Judge ROBERT C. HUNTER dissents in a separate opinion.

HUNTER, Robert C., Judge, dissenting.

Donald C. McCaskill ("petitioner") appeals the trial court's 23 February 2009 Order affirming the Final Decision of the Board of Trustees of the Teachers' and State Employees' Retirement System (the "Board of Trustees" or "respondent"), which determined that petitioner was not eligible for long-term disability benefits because he had not accumulated five years of membership service in the Teachers' and State Employees' Retirement System ("Re-

tirement System"). The Board of Trustees' decision accepted in part, rejected in part, and modified the Decision of the Administrative Law Judge ("ALJ"). The majority opinion of this Court affirms the trial court's order.

Due to my belief that the trial court erred and that the contract entered into between petitioner and the State of North Carolina was a lawful contract that in effect granted petitioner five years of membership service in the Retirement System, I respectfully dissent from the majority's holding. The trial court's order should be reversed and remanded with instructions for the trial court to remand this case to the Board of Trustees for modification of its Final Decision.

## Analysis

### I. Standard of Review

The trial court in this matter reviewed a Final Decision for the Board of Trustees in which the Board did not accept the recommendation of the ALJ.

> In reviewing a final decision in a contested case in which an administrative law judge made a decision, in accordance with G.S. 150B-34(a), and the agency does not adopt the administrative law judge's decision, the court shall review the official record, de novo, and shall make findings of fact and conclusions of law. In reviewing the case, the court shall not give deference to any prior decision made in the case and shall not be bound by the findings of fact or the conclusions of law contained in the agency's final decision. The court shall determine whether the petitioner is entitled to the relief sought in the petition, based upon its review of the official record. The court reviewing a final decision under this subsection may adopt the administrative law judge's decision; may adopt, reverse, or modify the agency's decision; may remand the case to the agency for further explanations under G.S. 150B-36(b1), 150B-36(b2), or 150B-36(b3), or reverse or modify the final decision for the agency's failure to provide the explanations; and may take any other action allowed by law.

N.C. Gen. Stat. § 150B-51(c) (2009).

> When this Court reviews appeals from superior court either affirming or reversing the decision of an administrative agency, our scope of review is twofold . . .: (1) whether the superior court applied the appropriate standard of review and, if so, (2) whether the superior court properly applied this standard.

*Corbett v. N.C. Div. of Motor Vehicles*, 190 N.C. App. 113, 118, 660 S.E.2d 233, 237 (2008). "Because the case before us involves a situation where the final agency decision rejected the decision of the ALJ, the appropriate standard of review for the trial court was *de novo.* The trial court stated the correct standard of review in its order. . . . We must now decide whether the trial court properly applied that standard of review." *Granger v. University of North Carolina at Chapel Hill*, —— N.C. App. ——, ——, 678 S.E.2d 715, 717 (2009) (internal citation omitted).

## II. Requirements for Long-Term Disability Benefits

As a preliminary matter, N.C. Gen. Stat. § 135-106(a) (2009) sets out the requirements for receipt of long-term disability benefits as follows:

> Upon the application of a beneficiary or participant or of his legal representative or any person deemed by the Board of Trustees to represent the participant or beneficiary, any beneficiary or participant who has had five or more years of *membership service* may receive long-term disability benefits from the Plan upon approval by the Board of Trustees . . . .
>
> . . . .
>
> As to the requirement of five years of *membership service,* any participant or beneficiary who does not have five years of membership service within the 96 calendar months prior to conclusion of the short-term disability period or cessation of salary continuation payments, whichever is later, shall not be eligible for long-term disability benefits.

(Emphasis added.) " 'Membership service' shall mean service as a teacher or State employee rendered while a member of the Retirement System." N.C. Gen. Stat. § 135-1(14) (2009). Accordingly, it is unquestioned that petitioner was required to render "membership service" for five years in order to qualify for long-term disability benefits.

Petitioner was granted leave without pay for portions of January 2002 through September 2002, interspersed with his accrued vacation and sick leave, so that he would be considered a full-time employee and reach his five years of membership service. It is undisputed that the Department of Health and Human Services ("DHHS") authorized this leave in order to comply with the terms of the settlement agree-

ment. Respondent claims that petitioner did not have five years of membership service because he was not accruing membership service while on leave without pay. Conversely, petitioner argues that he was accruing membership service from January 2002 through September 2002 despite the fact that he was on leave without pay for a part of each month. I agree with petitioner and would hold that the contract at issue was lawful and binding between petitioner and the State of North Carolina.

### III.  Petitioner's Contract with DHHS

Petitioner argues that the trial court erred in concluding as a matter of law that:

> Notwithstanding Petitioner's argument that he had a binding agreement with an agency of the State, the Retirement System was not a party to that agreement, nor was DHHS acting as the agent of the Retirement System. . . . Therefore, Petitioner is not entitled to enforce the terms of the agreement against the Retirement System.

I agree with petitioner and would hold that respondent is required to comply with the terms of the settlement agreement signed by petitioner and DHHS, which allowed petitioner to accumulate five years of membership service in the Retirement System by using his sick and vacation leave as well as leave without pay.

In this instance, petitioner had a binding contract with DHHS that provided him five years of membership service in the Retirement System through exhaustion of his leave and periods of leave without pay. *Harris v. Ray Johnson Constr. Co.*, 139 N.C. App. 827, 829, 534 S.E.2d 653, 654 (2000) ("A compromise and settlement agreement terminating or purporting to terminate a controversy is a contract . . . ."). The State of North Carolina is bound to fulfill the terms of a valid contract entered into by an agent of the State authorized by law to enter into such a contract. *Smith v. State*, 289 N.C. 303, 320, 222 S.E.2d 412, 423-24 (1976). Respondent does not contend that Secretary Odom was not authorized by law to enter into a contract with petitioner. In the notarized settlement agreement, Secretary Odom "warranted that she was vested with the authority to execute the foregoing document." DHHS has not breached this contract; however, respondent refuses to recognize the validity of the contract and claims that it violates North Carolina statutes and regulations. I disagree. Respondent has not pointed to any statutes or regulations that expressly prohibit the type of agreement at issue here. The majority acknowledges this

fact, but still holds that the contract is not binding on the Retirement System because " 'membership service' for purposes of determining eligibility for long-term disability benefits does not include periods when an employee is on unpaid leave." Accordingly, the majority holds that membership service is granted based on a "day-for-day credit approach." I disagree with the majority's position. I will address each of the statutes and regulations which respondent points to in support of its argument that the contract was unlawful. None of these arguments have merit.

First, as respondent points out, 25 N.C.A.C. § 1B.0436(a) states that "[a]ny settlement or consent agreement in a grievance or contested case which requires the processing of personnel action forms by the Office of State Personnel must be approved by the Office of State Personnel before such personnel action forms will be processed." However, 25 N.C.A.C. § 1B.0436(a) goes on to say, "[t]his provision shall also not be construed to require approval of any settlement the terms of which allow an employee to substitute a resignation for a dismissal and to withdraw a grievance or a contested case action." While the settlement agreement in this case went further than simply substituting a resignation for a dismissal, I still find that this provision is not applicable to the present situation. Petitioner did, in fact, substitute a resignation for a dismissal and withdrew his grievance against DHHS. Bill Guy, DHHS' Human Resources Assistant Director and Employee Relations Manager, testified at the hearing that it was his understanding that 25 N.C.A.C. § 1B.0436(a) was not applicable for that very reason. Accordingly, I disagree with the majority's position that the Office of State Personnel was required to approve the contract between petitioner and DHHS.

Respondent also cites N.C. Gen. Stat. § 135-4(v) (2009),[9] which allows retroactive membership service to be granted to a member "who had service as an employee," but whose service was "omitted from contributing membership through error." Respondent contends that at the time the settlement agreement was signed, N.C. Gen. Stat. § 135-4 did not provide for retroactive membership service to an individual who was reinstated after wrongful termination, and, therefore, there was no means by which petitioner could be awarded retroactive

9. Effective 1 August 2003, after the settlement agreement at issue was signed, N.C. Gen. Stat. § 135-4 was amended and now provides for retroactive membership service for a member who is reinstated subsequent to an involuntary termination. N.C. Gen. Stat. § 135-4 (ff). While the amended statute would arguably apply to the facts of this case, it was not in effect at the time the contract at issue was executed.

membership service. Respondent's argument is without merit. N.C. Gen. Stat. § 135-4(v) does not prohibit a contractual remedy for an aggrieved employee who was omitted from membership service due to involuntary termination. Pursuant to the settlement agreement, petitioner was retroactively reinstated as a full-time employee. Petitioner never sought retroactive membership service under this statute. The majority and I are in agreement that this statute does not provide much assistance in interpreting the meaning of membership service.

Finally, respondent contends, and the majority agrees, that short term leave under 25 N.C.A.C. § 1E.1112(a) is meant to be used when an employee has no accumulated leave, and, therefore, petitioner was not allowed to take unpaid leave until he had exhausted his sick and vacation leave. 25 N.C.A.C. § 1E.1112(a) specifies the purpose behind short term leave without pay—"to account for time that an employee is absent and has no accumulated or advanced leave credits." However, an employee may be granted "Other Types of Leave Without Pay" "for any other reasons deemed justified by the agency head." 25 N.C.A.C. § 1E.1101.

In this case, Secretary Odom, in her discretion, granted leave without pay to petitioner under the terms of the settlement agreement. I disagree with the majority's assertion that there are only two types of leave without pay, short term leave and extended leave. 25 N.C.A.C. § 1E.1101 provides for leave for "any other reasons deemed justified by the agency head." The wording of this personnel rule clearly grants the agency head, in this case Secretary Odom, the discretion to grant leave in situations outside of those defined in 25 N.C.A.C. § 1E.1111 and 25 N.C.A.C. § 1E.1112. At the hearing, Marshall Barnes, Deputy Director of the Retirement System, was unable to cite any rules or regulations that would require an employee to exhaust his or her leave continuously before taking leave without pay. (T pp. 573-74). Barnes was unable to do so because none exists. Accordingly, it is my position that 25 N.C.A.C. § 1E.1101 may be used in situations such as this to grant an employee leave without pay, so long as it is approved in the discretion of the agency head.

Regardless of the form of leave taken, the majority concedes that pursuant to 25 N.C.A.C. § 1D.0114 "[p]eriods of leave without pay do not constitute a break in service," therefore, petitioner maintained full-time employee status while on leave. The material dispute between the majority and I is that the majority holds that membership service should *always* be calculated on a day-for-day basis, while I

McCASKILL v. DEP'T OF STATE TREASURER

[204 N.C. App. 373 (2010)]

believe that an employee should be granted membership service credit for the entire month in some circumstances, such as in the present case. At the hearing, Barnes testified that the practice of the Retirement System is to grant a full month's retirement credit in some situations, particularly for the first and last month of employment. This testimony does not support a day-for-day calculation method; rather, it supports the opposite position—that in some circumstances an employee who contributes to the Retirement System for part of a month is awarded a full month's credit of membership service. Clearly the Retirement System is not strictly following a day-for-day accounting system at this time. If the majority position is upheld, then the current policies of the Retirement System will be deemed unlawful, an untoward result that would require the Retirement System to prohibit the grant of membership service for the first and last month of employment where the employee did not work the entire month, or in those unique circumstances that Barnes alluded to in his testimony.[10]

As the majority notes, in *Wiebenson v. Bd. of Trustees, State Employees' Ret. Sys.*, 345 N.C. 734, 739, 483 S.E.2d 153, 155 (1997) (*Wiebenson II*), *aff'g as modified*, 123 N.C. App. 246, 250, 472 S.E.2d 592, 595 (1996) (*Wiebenson I*), our Supreme Court held that a state employee involved in a job sharing program did not have a break in service during the months she was on leave of absence. The majority points to the fact that Wiebenson was only granted .5 credits in the Retirement System for the six months she was actually working, despite the fact that she was a full-time employee while on leave. The Supreme Court did take note of that fact in the opinion, but the Court did not hold that membership service was calculated on a day-for-day basis. Furthermore, Wiebenson was on extended leave for six months of the year in which she was likely not contributing to the Retirement System.[11] Petitioner in this case was granted leave without pay pur-

10. Although the majority claims that it is not commenting upon the Retirement System's current practices, the effect of its holding will certainly alter the Retirement System's practices, particularly with regard to the first and last month of employment.

11. To be clear, I recognize that being a full-time employee does not mean that the individual is automatically accruing membership service in the Retirement System. Clearly, Wiebenson was a full-time employee while on leave for six months; however, she was only accruing membership service during the months she was working and contributing to the Retirement System. As stated *supra*, that fact distinguishes *Wiebenson* from the present case. Here, petitioner was contributing to the Retirement System during the months in which he took leave without pay. In other words, petitioner, unlike Wiebenson, was a full-time employee *and* contributing to the Retirement System at all times he was employed.

suant to 25 N.C.A.C. § 1E.1101 (he was not on extended leave) during which time he was contributing to the Retirement System.[12]

In sum, it is my position that petitioner did not have to exhaust his sick and vacation leave prior to taking leave without pay, and, contrary to the majority opinion, membership service is not always based on a day-for-day calculation method.[13] Based on my interpretation of the applicable statutes and regulations, I see no prohibition against the settlement agreement entered into by DHHS with petitioner. This agreement reinstated petitioner so that he could achieve five years of membership service in the Retirement System. Additionally, respondent has not pointed to a statute or regulation that requires an employee to fully exhaust his or her leave prior to taking a leave of absence. Because no laws were violated, there was nothing illegal about this arrangement.

It is important to note that the language of the contract explicitly stated that the purpose was to reinstate petitioner "for the purpose of allowing him to use his accumulated sick and vacation leave hours to maintain his employment until he has attained five (5) years of contributing service in the Retirement System." The agreement went on to state that petitioner's sick or vacation leave would be equally apportioned to each month between January 2002 and September 2002 and the remaining days would be treated as leave without pay. There was no attempt to hide what petitioner bargained for and he received assurances from DHHS that the settlement agreement was in compliance with all statutes, rules, and regulations concerning retirement.

It is also important to recognize that, pursuant to this contract, petitioner relinquished his right to pursue his grievance against DHHS and that petitioner did not unilaterally propose this arrangement; rather, the State was involved in formulating the contract, which benefitted both the State and petitioner. Respondent is now attempting to invalidate a valid contract because it does not approve of the result.

Though there is no case law directly on point, it is my firm belief that when a party enters into a lawful contract with one agency of the State of North Carolina, all other agencies are bound to abide by its terms. Respondent may feel that petitioner circumvented the process

---

12. The State paid petitioner's contribution retroactively.

13. I am not, as the majority seems to imply, advocating a wholesale abandonment of the day-for-day credit approach.

of achieving five years of membership service, but that does not change the fact that petitioner was assured that the settlement agreement was sound and there is, in fact, no statute, regulation, or case law prohibiting this type of arrangement. If the legislature wishes to enact a statute expressly forbidding a contract of this nature, then it is free to do so. Moreover, the State itself may prohibit these types of contracts from being entered into by a state agency. However, as the laws and regulations currently exist, there is no prohibition in place that would make this contract unlawful.[14]

Upon fulfilling the terms of the contract, petitioner had five years of membership service and was, therefore, vested in the Retirement System. *George v. George*, 115 N.C. App. 387, 389, 444 S.E.2d 449, 450 (1994) (A pension "vests" when " 'an employee has completed the minimum terms of employment necessary to be entitled to receive retirement pay at some point in the future.' ") (quoting *Milam v. Milam*, 92 N.C. App. 105, 107, 373 S.E.2d 459, 460 (1988), *disc. review denied*, 324 N.C. 247, 377 S.E.2d 755 (1989)), *cert. denied*, 342 N.C. 192, 463 S.E.2d 236 (1995).

### IV. Collateral Estoppel

Assuming, *arguendo*, that the contract violated an applicable statute or regulation, petitioner also alleges that the trial court erred in holding as a matter of law that no form of estoppel applied to this case. I agree.

> It is elementary that when one, with no authority whatever, or in excess of the limited authority given him, makes a contract as agent for another, or purporting to do so as such agent, the supposed principal, upon discovery of the facts, may ratify the contract, in which event it will be given the same effect as if the agent, or purported agent, had actually been authorized by the principal to make the contract prior to the making thereof.

*Wiebenson I*, 123 N.C. App. at 250, 472 S.E.2d at 595 (quoting *Patterson v. Lynch, Inc.*, 266 N.C. 489, 492, 146 S.E.2d 390, 393 (1966)).

The Supreme Court in *Wiebenson II* did not overturn this Court's holding in *Wiebenson I* where we held that the Retirement System

---

14. Clearly, a state agency may not act outside of the bounds of laws and regulations set up by our legislature or the State through its Administrative Code. For example, if one agency attempted to change the retirement benefits formula set forth by the State, then that action would not be acceptable. That is not the case here where DHHS acted in accord with state laws and regulations.

was estopped from denying Wiebenson her retirement benefits. This Court held:

> Here, petitioner's supervising ARC director indicated to her in his memo that he had discussed the possibility of petitioner and Ms. Brank sharing one position with the Department of Human Resources and that DHR had approved the job-sharing option. Petitioner's director also explicitly stated to petitioner in his memo that petitioner would continue to be a participating member of the Retirement System. *We conclude that the ARC director, by his statements, purported to be the Retirement System's agent and that petitioner reasonably relied on his representations.* The record includes copies of yearly statements that the Retirement System provided to petitioner for each year from 1985 through 1990 which indicated that she was continuing to accumulate retirement credit in the Retirement System. We conclude that the Retirement System ratified the director's representations and statements to petitioner by continuing to accept her contributions to the Retirement System and by continuing to send petitioner yearly statements indicating that petitioner was still a participating member of the Retirement System. Accordingly, we also conclude that the Retirement System may not now assert that petitioner is not entitled to retirement credit for the years that she participated in the job-sharing program.

*Id.* at 250, 472 S.E.2d at 595 (emphasis added). *Wiebenson I* analogized the case, at least in part, to *Fike v. Bd. of Trustees*, 53 N.C. App. 78, 279 S.E.2d 910, *disc. review denied*, 304 N.C. 194, 285 S.E.2d 98 (1981). In *Fike*, the petitioner filed for retirement benefits on behalf of his ailing wife. *Id.* at 78, 279 S.E.2d at 911. Upon submitting the forms to Ruth Ellis, the Payroll and Benefits Manager employed by the University where his wife worked, petitioner believed that the forms would be filed and no further action was required on his part. *Id.* Petitioner then learned that Ellis had not filed the retirement disability forms with the Retirement System. *Id.* at 79, 279 S.E.2d at 911. Petitioner advised Ellis to file them, but by the time Ellis did so, the effective date was November 1978 and petitioner's wife died in October 1978. *Id.* at 79, 279 S.E.2d at 912. The Retirement System claimed that petitioner's wife was not retired at the time of her death and refused to grant petitioner her accrued benefits. *Id.* This Court held that even though the Retirement System did not have "sufficient control over Mrs. Ellis, or her employer, for her to be its actual agent" the Retirement System Handbook instructed prospective retirees to submit the forms to his or her personnel officer, in that case Ellis. *Id.*

at 81, 279 S.E.2d at 913. Petitioner complied with that process. *Id.* In *Wiebenson I*, we found that *Fike* was "arguably distinguishable" in that Wiebenson had not reviewed a handbook that directed her to rely on her director's representations; nevertheless, the Court found that ratification applied in that case because Wiebenson relied on assurances from a person who claimed to be knowledgeable about the Retirement System's rules and regulations. *Wiebenson I*, 123 N.C. App. at 250, 472 S.E.2d at 595.

Similarly, as seen in *Wiebenson I*, Guy, who informed petitioner that his retirement vesting was secure, was not a member of the Retirement System, but purported to be knowledgeable and made assurances to petitioner. "[B]y his statements, [Guy] purported to be the Retirement System's agent and . . . petitioner reasonably relied on his representations." *Id.* Additionally, as stated by the ALJ:

> The preponderance of the evidence showed that Respondent accepted DHHS retirement benefit contributions on Petitioner's behalf, and never returned those contributions to Petitioner. By accepting and never returning Petitioner's retirement contributions, *Respondent ratified DHHS' retirement contributions for Petitioner, and indicated that Petitioner was still a participating member of the Retirement System.*

Because petitioner relied on Guy's assurances that the contract did not violate any rules or regulations of the Retirement System, and the Retirement System ratified Guy's assertions by accepting the contributions from petitioner and not returning them, I would hold that respondent is now estopped from denying petitioner five years of membership service.[15]

I would also posit that the State as a whole is estopped from denying petitioner what he bargained for in the contract signed by DHHS, a State agency. The contract was lawful, clearly set out what petitioner bargained for, and yielded a benefit to the State (petitioner's relinquishment of his right to pursue his action for wrongful termination). DHHS, the drafter of the contract, has never sought to have the contract declared unlawful and the Retirement System has no valid grounds for attempting to do so now.

---

15. The majority states that the Retirement System is not estopped because it never told petitioner that his contract was lawful. The majority ignores the fact that in *Wiebenson* and *Fike*, the purported assurances made to the petitioners were made by individuals not employed by the Retirement System. The Retirement System was estopped in those cases because it ratified the statements made to the petitioners, even where those persons were not officially agents of the Retirement System.

Conclusion

In this case, the State of North Carolina entered into a valid contract with petitioner which respondent now seeks to avoid. As stated *supra*, Secretary Odom had the authority to enter into this contract and she had the authority to grant petitioner leave without pay for a portion of each month. Petitioner obtained five years of membership service by contributing to the Retirement System for each month he was employed.

Due to my determination on these issues, I would not address petitioner's remaining assignments of error. Accordingly, under the unique facts of this case, I would reverse the order of the trial court and remand to the trial court with instructions to remand to the Board of Trustees to amend its Final Decision.